**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| SHAWNA E. CHRISTOPHER-DELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     **Case No. 4:13CV954 ACL** |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final decision denying the application of Shawna E. Christopher-Dell for Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. [Doc. 17] Defendant filed a Brief in Support of the Answer. [Doc. 22]

## Procedural History

On July 23, 2010, Plaintiff filed an application for Disability Insurance Benefits, claiming that she became unable to work due to her disabling condition on January 1, 2009. (Tr. 144-50.) Plaintiff subsequently amended his alleged onset date to September 30, 2009. (Tr. 26.) The Plaintiff's application was initially denied. (Tr. 59) Following an administrative hearing, Plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated January 6, 2012. (Tr. 6-22.) Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on March 19,

2013.  (Tr. 5, 1-3.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.      ALJ Hearing**

Plaintiff's administrative hearing was held on July 13, 2011.  (Tr. 25.)   Plaintiff was present and represented by counsel.  Id.   Also present was vocational expert Rita Payne.   Id.

Plaintiff's attorney made an opening statement, in which he argued that Plaintiff suffers from low back pain, sleep apnea, severe swelling of the left leg, hearing loss in the right ear, depression, and anxiety.  (Tr. 27.)   Plaintiff's attorney stated that Plaintiff's psychological problems pre-date her date last insured.  Id.   In addition, Plaintiff's attorney stated that he does not believe a listing is met.  Id.

The ALJ questioned Plaintiff, who testified that she was twenty-three years of age; five-feet, six inches tall; and weighed 350 pounds.  (Tr. 28.)   Plaintiff stated that her normal weight is 220 to 250 pounds.  Id.   Plaintiff testified that her gynecologist indicated her weight gain was caused in part by her "feminine issues."  Id.

Plaintiff testified that she has a valid driver's license, and that she drives "for a little while." (Tr. 29.)   Plaintiff stated that she starts to experience back pain and a tingling sensation in her lower back after driving for about twenty minutes.  Id.

Plaintiff testified that she graduated from high school and cosmetology school.  Id.   The cosmetology school made adjustments for her by allowing her to take breaks between clients rather than requiring her to stand eight hours straight.  (Tr. 29-30)   Plaintiff attended Columbia College at Lake of the Ozarks for one semester, however, stopped attending college to pursue a

career in cosmetology.   (Tr. 30)

Plaintiff graduated from cosmetology school in March of 2011, however, has not worked as a cosmetologist, because she does not have a license.   (Tr. 30-31)   Plaintiff cannot take the state boards required for a license until she pays a debt owed to a cosmetology school she attended, plus she will require accommodations allowing her to sit down and she has not yet been granted those accommodations.   Id.

Plaintiff testified that she was not working at the time of the hearing.   (Tr. 31)   Her last job was working at the front counter at Burger King in 2009.   (Tr. 31-32)   She worked at this position for a "couple weeks," and left because her vehicle was totaled in an accident and she lacked transportation.   (Tr. 31)

Plaintiff stated that she started attending cosmetology school in September of 2008, but took several periods of leave due to medical issues (including swollen tonsils, sleep apnea, and narcolepsy) before finishing in March 2011.   (Tr. 32)   She also transferred to a different cosmetology school closer to her home.   Id.

Prior to working at Burger King, Plaintiff worked as a stocker at ALCO, a retail store located in Minnesota.   (Tr. 33.)   She lifted approximately twenty-five pounds at this position and left the position when she moved back to Missouri.   Id.   Plaintiff also worked at the front desk taking reservations and answering the phone at Walleye Inn, but left the job, because she "didn't like it."   (Tr. 34)   She worked as a dietary aide at Windsor Estates and was terminated from that position, because she did not show up for work and did not call to notify her employer.   Id.   Plaintiff worked as a preschool teacher for "a couple years" at various locations.   (Tr. 35)   She also had jobs at a shoe store as a salesperson for a summer, Walgreens in the beauty department for

six to eight months, and Denny's as a waitress and as a hostess for a summer when she was in high school.   (Tr. 34-36.)   Finally, Plaintiff worked at the Gap stocking clothes for about eleven months; she was terminated from this position when she did not show up to work.   (Tr. 36-37.)

Plaintiff testified that she was unable to work at the time of the hearing because she was only able to stand for about twenty minutes before she needing to lean or sit down; and she is only able to sit for about thirty minutes before she starts getting uncomfortable and experiencing pain in her back.   (Tr. 37)   The pain in her lower back is constant, id., and Plaintiff rated her back pain as a six on a scale of zero to ten (Tr. 38).   Plaintiff testified that her pain is decreased when she lies down, but standing and walking cause her pain to increase.   Id.   She also has pain and swelling in her left leg from her knee down to her toes; the swelling started in October of 2009, and it has not stopped.   (Tr. 38-39.)   The swelling decreases when Plaintiff sleeps.   (Tr. 39.)

Plaintiff moved to Nebraska where she sees an orthopedic surgeon, Dr. Harris.   (Tr. 40.) He ordered x-rays and an MRI.   Id.   Dr. Harris told Plaintiff that the imaging did not reveal any bone damage, and referred her to a neurologist.   (Tr. 41)   The ALJ indicated that he would leave the record open for thirty days to allow Plaintiff to submit the records from Dr. Harris.   (Tr. 42.)

Plaintiff also stated that she had upcoming appointments scheduled with a psychiatrist (Tr. 42, 49) and a primary care physician (Tr. 41).

At the time of the hearing, Plaintiff was taking Ativan,[1] Zantac,[2] Flexeril,[3] Naproxen,[4]

---

[1]Ativan is indicated for the treatment of anxiety.   See WebMD, http://www.webmd.com/drugs (last visited September 17, 2014).
[2]Zantac is indicated for the treatment of gastroesophageal reflux disease ("GERD").   See Physician's Desk Reference (PDR), 1672 (63rd Ed. 2009).
[3]Flexeril is indicated for the treatment of muscle spasms.   See WebMD, http://www.webmd.com/drugs (last visited September 17, 2014).
[4]Naproxen is a nonsteroidal anti-inflammatory drug indicated for the relief of osteoarthritis.   See PDR at 2633.

Zoloft,[5] and Abilify[6] daily, as well as Excedrin. (Tr. 43.) Plaintiff stated that her medications help her "for the most part"; clarifying that she still experiences pain when she takes her medications, but the medication "definitely eases it up and keep it to where it's tolerable," so that she is able to "kind of function." Id. Plaintiff experiences "extreme drowsiness," as a side effect from her medication. Id.

Plaintiff stated neither surgery nor injections have been recommended for her back pain. Id. She is able to bend over, climb a flight of stairs, and while she can lift a gallon of milk, she does not. (Tr. 44.) Plaintiff testified that her gynecologist recently restricted her to lifting only ten pounds due to her ovarian disease. about two to three times a day

Plaintiff stated that she saw a psychiatrist on one occasion upon the referral of her caseworker. (Tr. 45) The psychiatrist told Plaintiff she has symptoms consistent with bipolar disorder and borderline personality disorder. Id. Plaintiff stated that she had an appointment scheduled with a psychiatrist for the month following the hearing. Id. Plaintiff testified that Dr. George Stachecki prescribed Abilify. Id. Plaintiff indicated that she has difficulty with concentration and short-term memory and difficulty dealing with people (Tr. 45); she does fine in small groups of people, but she gets frustrated when she is in large groups (Tr. 46).

On a typical day, Plaintiff takes a shower, lets her dog out, sits down to watch the news, and eats breakfast. Id. She spends the rest of her day alternating between lying down, walking around, and sitting watching television. Id. Plaintiff occasionally watches her nieces and nephews at her home--they are 21 months, three, four, and ten years of age. Id. Approximately

---

[5]Zoloft is indicated for the treatment of depression. See WebMD, http://www.webmd.com/drugs (last visited September 17, 2014).

[6]Abilify is an antipsychotic drug indicated for the treatment of bipolar disorder and major depressive disorder. See PDR at 881.

once per week, Plaintiff watches all four children by herself for "about a couple hours." (Tr. 47.) Plaintiff makes bracelets as a hobby about two to three times a day, especially when she feels depressed. Id. Plaintiff does not go shopping without her husband. Id.

Upon examination by her attorney, Plaintiff testified that she was adopted at the age of five. (Tr. 48.) Although her biological parents came in and out of her life for a period of time after she was adopted, they eventually stopped contacting her. Id. Plaintiff saw a counselor, Joyce Coleman, from the age of five to the age of nine, however, those records are unavailable. Id.

Plaintiff stated that Dr. Stachecki started prescribing Zoloft and Abilify in 2010. Id. Plaintiff testified that she takes these medications daily, although she forgot to take them the morning of the hearing. (Tr. 49.)

Plaintiff testified that, when she is depressed, she feels as though there is "no point of being here," and she cries; this occurs three to five times a week and Plaintiff isolates herself during these episodes. Id. She has experienced these episodes since high school. Id.

Plaintiff leaves her home about three times a week, however, she stated that it is difficult to leave, because she does not like being around a lot of people. Id. Plaintiff indicated she started avoiding people when she had problems related to sleep apnea. (Tr. 50.)

Plaintiff testified that she currently has health insurance through her husband's employer in Nebraska. Id. Prior to having insurance, she went to the emergency room for treatment. Id.

Plaintiff testified that she weighed 350 pounds at the time of the hearing, and that she weighed 250 pounds in September of 2009. Id. Plaintiff stated that, due to the weight gain, it is more difficult for her to put on shoes, and to just get around in general. (Tr. 51.) Plaintiff is unable to wear tennis shoes due to her leg swelling, and usually wears flip flops. Id. She is also

"hot all the time," Plaintiff was less hot prior to her weight gain. <u>Id.</u> Plaintiff stated that she is "always tired," although she did not know whether her fatigue was caused by the weight gain or her medication. <u>Id.</u>

**B.** **Supplemental Hearing**

A supplemental hearing was held on December 7, 2011, to take testimony vocational expert (VE) Dolores Gonzalez. (Tr. 55.)

Plaintiff's attorney asked the VE to assume a hypothetical claimant with Plaintiff's background and the following limitations: limited to sedentary, unskilled work; able to sit for thirty minutes at one time before needing to get up; can stand for thirty minutes before needing to sit down or walk around; can walk one fourth of one mile without rest; can sit for a total of four hours in an eight-hour workday with normal breaks; and can stand and walk a total of two hours in an eight-hour workday with normal breaks. (Tr. 56.) The VE testified that the individual would be unable to work competitively. (Tr. 57.)

Plaintiff's attorney next asked the VE to assume the hypothetical posed by the ALJ in question number seven, which was sent to the VE by mail with the addition of a limitation of being absent three times a month. <u>Id.</u> The VE testified that the hypothetical claimant would be unable to maintain competitive employment at that rate of absenteeism. <u>Id.</u>

**C.** **Relevant Medical Records**

On May 10, 2009, Plaintiff presented to the emergency room at St. Joseph Health Center-Wentzville with complaints of right-sided ear pain with discharge. (Tr. 245.) The examining physician, Navin Choudhary, M.D., noted a depressed, flat affect, on examination. (Tr. 247.) Dr. Choudhary prescribed antibiotics for Plaintiff's ear infection. (Tr. 248.)

Six months later, Plaintiff went to the emergency room with complaints of a sore throat, sinus congestion, and earache.  (Tr. 253.)   No abnormalities were noted on examination.  (Tr. 253-54.)   Plaintiff was diagnosed with acute pharyngitis and throat pain, and was prescribed antibiotics.  (Tr. 255.)

Less than two months later, Plaintiff went to the emergency room with complaints of persistent sore throat for the prior two months.  (Tr. 416.)   She also reported difficulty sleeping at night, possibly due to the sore throat and tonsillar swelling, and that she falls asleep unexpectedly during the day.  Id.   Upon physical examination, Plaintiff was noted to be morbidly obese and in no obvious distress.  Id.   Plaintiff's tonsils were markedly enlarged.  (Tr. 417)   Plaintiff was prescribed a steroid, and was advised to follow-up with her primary care physician.  (Tr. 418)

Plaintiff presented to George P. Stachecki, M.D., on February 5, 2010, with complaints of chronic sore throats, sleep issues, over active bladder, and bipolar disorder.  (Tr. 317.)   Plaintiff reported she was a smoker for seven years.  Id.   Dr. Stachecki diagnosed Plaintiff with tonsillitis, obesity, and apnea.  (Tr. 319.)   He recommended that Plaintiff see an ENT for her tonsillitis.  Id.   Dr. Stachecki stated that he hoped an ENT would work with Plaintiff regarding her finances because she has "large exudative tonsils that meet the midline and are probably compounding her other medical problems."  Id.   Dr. Stachecki also had a "lengthy conversation" with Plaintiff regarding "the hard work of losing weight."  Id.

Plaintiff underwent testing at Barnes-Jewish St. Peters Hospital Sleep and Breathing Lab on February 28, 2010.  (Tr. 270-87.)   Plaintiff was diagnosed with severe obstructive sleep apnea[7] syndrome made complex sleep apnea with the use of a continuous positive airway pressure

_____

[7]A disorder characterized by recurrent interruptions of breathing during sleep, due to temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues, with

("CPAP") machine; severe sleep hypoxemia;[8] morbid obesity with body mass index in excess of 50; severe fragmentation of sleep secondary to sleep apnea; and excellent response to bi-level positive airway pressure ("BiPAP") machine. (Tr. 287.) It was recommended that Plaintiff be placed on the BiPAP, lose weight, and exercise daily. Id.

Plaintiff underwent surgical removal of her tonsils and adenoids to treat tonsil and adenoid hypertrophy and obstructive sleep apnea on March 24, 2010. (Tr. 377.)

Plaintiff presented to Dr. Stachecki on August 3, 2010, with complaints of lower extremity edema and anxiety. (Tr. 315.) Plaintiff reported great benefit from the use of Abilify. Id. Upon examination, Dr. Stachecki noted Plaintiff complained of back pain. (Tr. 316.) Dr. Stachecki diagnosed Plaintiff with obesity and chronic hypertension. Id. He recommended weight reduction, and refilled prescriptions for Zoloft, Ativan, and Abilify. Id.

Plaintiff presented to Dr. Stachecki on September 15, 2010, with complaints of edema, back pain, and numbness. (Tr. 355.) Dr. Stachecki noted that edema was still a problem secondary to Plaintiff's obesity. Id. Plaintiff's medications were noted to include: Flexeril and Clinoril, Zoloft, Prilosec, Ativan, and Abilify. Id. Upon examination, no skeletal tenderness, joint deformity, or edema was noted. (Tr. 356.) Dr. Stachecki diagnosed Plaintiff with lumbago, and added prescriptions for. Id. He recommended that Plaintiff stretch daily and continue to lose weight. Id.

On January 13, 2011, Plaintiff complained of worsening lower back pain. (Tr. 350.) Upon examination, Plaintiff had normal musculature, no skeletal tenderness or joint deformity, and no edema. (Tr. 351.) Dr. Stachecki noted there was "no unusual anxiety or evidence of

resultant hypoxemia and chronic lethargy. Stedman's at 119.
[8]Subnormal oxygenation of arterial blood. Stedman's at 939.

depression" on examination. (Tr. 352.) Dr. Stachecki diagnosed Plaintiff with obesity and low back pain syndrome. Id. Dr. Stachecki discussed with Plaintiff the correlation between her weight and back pain, and recommended weight reduction and regular daily stretching. Id. He continued the Flexeril, noting that it had been helpful in relieving Plaintiff's pain. Id.

Plaintiff presented to Justin D. Harris, M.D., at Nebraska Orthopaedic and Sports Medicine, on June 23, 2011, for evaluation of her left leg and low back pain. (Tr. 391-92.) Plaintiff reported low back pain as well as burning pan into her buttock and numbness and tingling in the lateral lower leg, plus swelling with prolonged periods of ambulation in the lower leg. (Tr. 391) Upon physical examination, Dr. Harris noted pitting edema in the left lower leg from the ankle to the mid-shin; mild tenderness with palpation of the lateral-sided lower leg; and positive straight leg raise with pain in the buttock and burning pain through the lateral lower leg, as well as increased numbness and tingling. Id. Plaintiff had good strength, full motor and sensory function, and full range of motion. Id. Dr. Harris diagnosed Plaintiff with left-sided back pain with possible lumbar radiculopathy. Id. He ordered an MRI of the low back. (Tr. 392.)

Plaintiff underwent an MRI of the lumbar spine on June 23, 2011, which was normal. (Tr. 390.) Dr. Harris reviewed Plaintiff's MRI on June 27, 2011; he did not see any significant pathology and referred Plaintiff to a physiatrist. (Tr. 389.)

Dr. Harris completed a Physical Residual Functional Capacity Questionnaire on August 11, 2011. (Tr. 241-44.) He had seen Plaintiff on one occasion for left-sided back pain; and burning and numbness/tingling in the left leg. (Tr. 241.) Dr. Harris listed his clinical findings as: pitting edema of the left ankle to shin, tenderness to palpation of the lateral side of the left leg, and positive straight leg raise. (Tr. 389.) Dr. Harris indicated that Plaintiff's experience of pain

was seldom severe enough to interfere with attention and concentration, and that Plaintiff was capable of low stress jobs. (Tr. 242.) He noted that Plaintiff experienced no medication side effects. (Tr. 399.) Dr. Harris expressed the opinion that Plaintiff could sit for thirty minutes at a time, and sit a total of four hours in an eight-hour work day; stand for thirty minutes at a time, and stand a total of two hours in an eight-hour work day; must walk every sixty minutes for five minutes; requires unscheduled breaks two times a day for ten minutes; can frequently lift less than ten pounds, occasionally lift ten pounds, and rarely lift twenty pounds; and can rarely twist, stoop, crouch, and climb ladders and stairs. (Tr. 242-44.) Finally, Dr. Harris estimated that Plaintiff would likely be absent from work as a result of her impairments or treatment about three days per month. (Tr. 244.)

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2009.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2009 through her date last insured of September 30, 2009 (20 CFR 404.1571 *et seq*.).

3. Through the date last insured, the claimant had the following severe impairments: low back pain, obesity, edema (leg), and depression (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR404.1567(a) except that she is limited to unskilled work, she requires a sit/stand option every 45 minutes while remaining on task, and she can only have occasional interaction with the public.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on May 26, 1988 and was 21 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not an issue in this case because the claimant is limited to unskilled work (20 CFR 404.1568).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2009, the alleged onset date, through September 30, 2009, the date last insured (20 CFR 404.1520(g)).

(Tr. 11-18.)

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on April 26, 2010, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act through September 30, 2009, the last date insured.

(Tr. 18.)

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.   See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).   The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.   See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).   Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion. See <u>Kelley v. Callahan</u>, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." <u>Id.</u>

**B.      Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See <u>Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); <u>Fines v. Apfel</u>, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§

404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.   See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).   The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:   activities of daily living, social functioning, concentration, and persistence or pace.   See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.   See id.   Next, the Commissioner must determine the severity of the impairment based on those ratings.   See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.   See id.   If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.   See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.   Plaintiff's Claims

Plaintiff argues that the ALJ erred in assessing the credibility of her subjective complaints

of pain and limitation.   Plaintiff also contends that the ALJ's RFC determination is not based on substantial evidence.   The undersigned will discuss Plaintiff's claims in turn.

## 1.      Credibility Analysis

Plaintiff first argues that the ALJ erred in considering the credibility of Plaintiff's subjective complaints.   Plaintiff contends that the ALJ failed to provide "good reasons" for discrediting Plaintiff's testimony, and based her decision on a lack of objective medical evidence.

An ALJ may not disregard a claimant's subjective complaints solely, because they are not fully supported by objective medical evidence.   Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) (citing Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995)).   Instead, in addition to considering objective medical evidence, the ALJ must consider all evidence relating to the claimant's complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions, *i.e.,* the Polaski factors*.*   Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Ramirez, 292 F.3d at 581; Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).   While an ALJ need not explicitly discuss each Polaski factor in her decision, she nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints.   Wildman v. Astrue*,* 596 F.3d 959, 968 (8th Cir. 2010).

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her

testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004). It is

not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically

demonstrate in his decision that he considered all of the evidence. Id. at 738. See also Cline v.

Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski

factors, but then discredits a claimant's complaints for good reason, the decision should be upheld.

Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility

is for the Commissioner, and not the Court, to make. Tellez v. Barnhart, 403 F.3d 953, 957 (8th

Cir. 2005); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).

Here, contrary to Plaintiff's assertion, the ALJ set out numerous inconsistencies other than

the lack of objective medical evidence to find Plaintiff's subjective complaints to be not entirely

credible. The ALJ first noted that Plaintiff testified that her back pain is relieved with medication.

(Tr. 14.) Impairments that are controllable or amenable to treatment do not support a finding of

disability. Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). Plaintiff argues that the ALJ's

characterization of her testimony was "inexact." (Doc. No. 17, p. 6.) The record reveals that

Plaintiff testified that her medications help her "for the most part." (Tr. 43.) Plaintiff stated that

she is "still in pain," yet her medication keeps her pain to a "tolerable" level to allow her to "kind

of function." Plaintiff's testimony supports the ALJ's finding that Plaintiff's medication is

effective in reducing her pain. "[T]he question is not whether [plaintiff] suffers any pain; it is

whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents

her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). In

addition, this finding is supported by the medical record. Notably, Dr. Stachecki found that

Plaintiff's back pain improved with the use of Flexeril. (Tr. 14, 350, 352.)

Plaintiff argues that the ALJ failed to consider the alleged side effects of Plaintiff's medications. Plaintiff testified at the hearing that her medications caused "extreme drowsiness." (Tr. 43.) Although it is true the ALJ did not discuss Plaintiff's alleged drowsiness as a side effect, the medical record does not indicate that Plaintiff complained of this side effect to her physicians. In fact, Dr. Harris specifically noted in his Physical Residual Functional Capacity Questionnaire that Plaintiff experienced no medication side effects. (Tr. 399.) Thus, the ALJ did not err in failing to discuss Plaintiff's alleged extreme drowsiness as a medication side effect.

The ALJ next noted that Plaintiff has never had physical therapy or injections for her pain, and no physician has ever suggested surgery to relieve her pain. (Tr. 14.) Plaintiff argues that the lack of physical therapy, injections, and surgery is not inconsistent with her allegations of pain. The ALJ did not err in pointing out that Plaintiff received only conservative care for her physical complaints.

Plaintiff argues that the ALJ failed to consider whether Plaintiff's treatment was limited by financial issues. Plaintiff, however, has provided no evidence that she was denied medical treatment due to an inability to afford care. See Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case where there was no evidence that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay).

The ALJ next noted that Plaintiff is planning to become a licensed "beautician, a job that requires standing at least some of the time." (Tr. 14.) The ALJ stated that Plaintiff's goal of becoming a beautician "is an indication that she feels capable of gainful employment in the field of cosmetology." (Tr. 13.) The ALJ also properly pointed out that Plaintiff left her last job due to

transportation issues rather than her alleged disability.  (Tr. 13, 31.)  Plaintiff testified that she quit all of her previous jobs due to relocating or other issues unrelated to her alleged disability. (Tr. 33-37.)  See Johnson v. Astrue, 628 F.3d 991, 995-96 (8th Cir. 2011) (complaints of disabling pain discredited by evidence that claimant never quit a job on account of her impairments).

The ALJ next stated that the objective medical evidence does not support a finding that Plaintiff's back pain is so severe that she is unable to work.  (Tr. 14.)  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).    The ALJ noted that Plaintiff's primary care physician, Dr. Stachecki, advised Plaintiff to lose weight and prescribed pain medication, and that the pain medication was effective. (Tr. 14, 350, 352.)   The ALJ pointed out that orthopedist Dr. Harris examined Plaintiff in June 2011, and found Plaintiff had full range of motion, normal strength, normal stability, and a normal neurovascular exam.   (Tr. 14, 392.)   Dr. Harris ordered an MRI of the lower back, which did not reveal any significant pathology.   (Tr. 14, 390, 389.)   The ALJ properly noted that the objective medical evidence did not support Plaintiff's complaints of disabling back pain.

Plaintiff argues that the ALJ did not properly consider Plaintiff's diagnosis of obesity. Contrary to Plaintiff's argument, the ALJ discussed Plaintiff's obesity, and found it was a severe impairment.   (Tr. 11.)   The ALJ noted Plaintiff's testimony that she is unable to wear tennis shoes and tolerate heat due to her weight gain.   (Tr. 14.)   The ALJ also acknowledged that Dr. Stachecki counseled Plaintiff on the effect of her weight on her back pain, and indicated that her

edema is secondary to her weight. The ALJ did not err in discussing Plaintiff's obesity when summarizing the objective medical evidence.

With regard to Plaintiff's mental impairments, the ALJ noted that Plaintiff's mental health treatment records were very limited. (Tr. 15.) Plaintiff was prescribed psychotropic medication for anxiety by her primary care physician in St. Louis, Dr. Stachecki. Dr. Stachecki indicated that Plaintiff "found great benefit" from Abilify. (Tr. 315.) On Plaintiff's last visit with Dr. Stachecki in January of 2011, Dr. Stachecki noted there was "no unusual anxiety or evidence of depression" on examination. (Tr. 352.) The medical evidence does not support the presence of a disabling mental impairment.

Finally, the ALJ discussed Plaintiff's daily activities. The ALJ found that Plaintiff had only mild restriction of her daily activities. (Tr. 16.) The ALJ noted that Plaintiff is able to live independently with her husband, care for her personal needs, and keep house. The ALJ further stated that Plaintiff's "lifestyle is consistent with an individual who can maintain regular employment." (Tr. 16.) Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). Plaintiff argues that that the ALJ improperly discredited Plaintiff's complaints based on her ability to perform ordinary life activities. Plaintiff testified at the hearing that she was able to not only perform ordinary daily activities, but also care for her four young nieces and nephews on a regular basis. (Tr. 46-47.) The ALJ properly found that Plaintiff's level of daily activities was one factor detracting from the credibility of her allegations of disabling pain.

In sum, the ALJ set out numerous inconsistencies that detracted from the credibility of Plaintiff's subjective complaints in a manner consistent with and as required by Polaski. The

ALJ's determination that Plaintiff's subjective complaints were not fully credible is supported by good reasons and substantial evidence in the record as a whole, therefore, this Court must defer to the ALJ's credibility determination.   Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005).

**2.      Residual Functional Capacity**

Plaintiff next argues that the ALJ's RFC determination is not supported by substantial evidence.   The ALJ made the following determination with regard to plaintiff's RFC:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR404.1567(a) except that she is limited to unskilled work, she requires a sit/stand option every 45 minutes while remaining on task, and she can only have occasional interaction with the public.

(Tr. 13.)

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.   Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.   See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).   Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.   See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).   An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.   See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

In determining Plaintiff's RFC, the ALJ first properly evaluated the credibility of Plaintiff's subjective complaints of pain and limitation, as discussed above. The ALJ then cited medical evidence upon which he was relying. The ALJ noted that Plaintiff's MRI of the lumbar spine was normal. (Tr. 390.) The ALJ pointed out that Dr. Harris found upon examination that Plaintiff had good strength, full motor and sensory function, and full range of motion. (Tr. 391.) The ALJ also discussed the Physical Residual Functional Capacity Questionnaire completed by Dr. Harris on August 11, 2011. (Tr. 241-44.) He noted clinical findings of pitting edema of the left ankle, tenderness to palpation of the lateral side of the left leg, and positive straight leg raise. (Tr. 241.) The ALJ noted that Dr. Harris found that Plaintiff was capable of performing work activities generally consistent with sedentary work, with a sit/stand option. (Tr. 15, 242-44.) This finding supports the ALJ's physical RFC determination.

The ALJ acknowledged that Dr. Harris also found that Plaintiff could sit and stand/walk a total of less than eight hours per day, and that Plaintiff would be absent from work about three days a month. The ALJ found that this portion of Dr. Harris' opinion was unsupported by the record. The ALJ pointed out that Dr. Harris' findings were based on only one visit. The ALJ further noted that the imaging of Plaintiff's spine was normal, and that Plaintiff left her past jobs for reasons other than her alleged disability. The ALJ provided sufficient reasons for not incorporating all the limitations found by Dr. Harris.

Plaintiff contends that the ALJ failed to properly consider Plaintiff's obesity, along with the fatigue she experiences either as a result of her obesity or as a side effect from her medications. The ALJ, however, considered Plaintiff's obesity and specifically stated that Plaintiff's "obesity has been taken into account in the limitations assessed and the determination that the claimant is

limited to less than sedentary work activity." (Tr. 14.) The ALJ found Plaintiff's obesity was a severe impairment and, as a result of Plaintiff's obesity, low back pain, and edema, limited Plaintiff to sedentary work with a sit/stand option. Plaintiff has failed to establish the presence of any greater limitations resulting from Plaintiff's obesity or fatigue.

In sum, the ALJ's RFC determination is supported by substantial evidence on the record as whole. The ALJ's determination that Plaintiff is capable of performing a limited range of sedentary work is supported by the medical evidence. With regard to Plaintiff's mental RFC, The ALJ credited Plaintiff's testimony regarding memory issues and a fear of being around crowds in limiting her to unskilled work, and only occasional interaction with the public. The record does not support the presence of any greater limitations. The ALJ concluded, with the assistance of a vocational expert, that Plaintiff could perform other jobs with this RFC, such as table worker and surveillance system monitor. (Tr. 17, 229.)

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding Plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment during the relevant period. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of September, 2014.